## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES REYNOLDS, | ) | |
| | ) | CASE NO. 1:12CV2994 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff Charles Reynolds ("Reynolds ") challenges the final decision of the Commissioner of Social Security, Carolyn W. Colvin[1] ("Commissioner"), denying his claim for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Title(s) II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is AFFIRMED.

---

[1]  Defendant indicates that Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013; and, that, pursuant to Fed. R. Civ. P. 25(d), Ms. Colvin should be substituted for Michael J. Astrue as the defendant in this suit.  (Doc. No. 16 at 1.)  Plaintiff does not object.

## I. Procedural History

On May 26, 2009, Reynolds filed an application for a POD and DIB, and on January 20, 2011, he filed an application for SSI. (Tr. 15, 126.) He alleged a disability onset date of January 1, 2004 and claimed he was disabled due to deafness in both ears and alcoholism. (Tr. 159.) His applications were denied both initially and upon reconsideration. Reynolds timely requested an administrative hearing.

On March 2, 2011, an Administrative Law Judge ("ALJ") held a hearing[2] during which Reynolds, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 31-62.) On March 16, 2011, the ALJ found Reynolds was able to perform a significant number of jobs in the national economy and, therefore, was not disabled. (Tr. 15- 25.) The ALJ's decision became final when the Appeals Council denied further review. (Tr. 1-4.)

## II. Evidence

### Personal and Vocational Evidence

Age fifty-three (53) at the time of his administrative hearing, Reynolds is a "person closely approaching advanced age" under social security regulations.[3] *See* 20 C.F.R. § 404.1563(d)/416.963(d). He has a high school education and six months of vocational education in diesel mechanics. (Tr. 39.) He has past relevant work as a polisher and quality control technician. (Tr. 54-55.)

---

[2] The Commissioner indicates Reynolds' SSI application "was consolidated with his POD/DIB appeal (at the hearing level), before an initial decision was made." (Doc. No. 16 at 2.)

[3] On his alleged onset date, Reynolds was 46 years old and, therefore, a "younger person" under social security regulations. *See* 20 C.F.R. § 404.1563(c)/416.963(c). As of the March 2011 hearing, he had changed age category to a "person closely approaching advanced age." (Tr. 23.)

***Medical Evidence***

The medical evidence regarding Reynolds's substance abuse and mental impairments is as follows.[4]  In June 4, 2003, Reynolds was admitted to Lake Geauga Center for in-patient alcohol dependence treatment.  (Tr. 537.)  He successfully completed treatment several months later and was described upon discharge as having "no mental health issues, or mental health interventions."  (Tr. 537.)  In August 2005, Reynolds was treated at the emergency room ("ER") for alcohol abuse and depression.  (Tr. 515.)  In November 2005, Reynolds underwent a mental health/substance abuse screening while incarcerated.[5]  (Tr. 591.)  Therein, he was described as having feelings of "hopelessness/depression" and a history of alcohol and drug problems.  (Tr. 591.)

Five years later, Reynolds sought treatment at Signature Health for depression and addiction.  (Tr. 828.)  On November 24, 2010, Rachel Fabian, LSW, conducted an initial assessment, in which she noted that Reynolds "has been experiencing depression since 2005 but has never received mental health services."  (Tr. 828.)  Reynolds reported that he became homeless in 2005 due to his drug use and unemployment, and indicated a history of suicidal ideations.  (Tr. 828.)  He also reported an "extensive history of drug and alcohol abuse," including abuse of alcohol, heroin, Vicodin and Percocet.  (Tr. 829.)  He was diagnosed with

---

[4]  The record also contains medical evidence regarding Reynolds's physical impairments. However, the Court finds it need not recount that evidence in order to resolve Reynolds's assignments of error.

[5]  The record indicates Reynolds has a history of incarcerations for various offenses.  In 2001, he was convicted of felony DWI and incarcerated for two years.  (Tr. 538, 829.)  In 2008, he was arrested for theft and incarcerated for 120 days. (Tr. 829.)  The record also suggests Reynolds has been arrested a number of times for public intoxication.  (Tr. 538, 829.)

depressive disorder, NOS and assessed a Global Assessment of Functioning ("GAF") score of 55.[6]  (Tr. 828.)  Ms. Fabian referred Reynolds to Denise Flynn, MSN CSN,[7] for a psychiatric evaluation.  (Tr. 847.)

Ms. Flynn conducted her initial evaluation of Reynolds on November 24, 2010.  (Tr. 847-848.)  She noted that he "presents with euthymic mood with complaints of anxiety and depression."  (Tr. 848.)  She assessed his concentration and focus as "normal" and his intelligence as "average."  (Tr. 848.)  Ms. Flynn diagnosed Reynolds with depression NOS, opioid dependence, and assessed a GAF of 55.  (Tr. 848.)  She prescribed a trial of Oleptro to treat his anxiety, depression, and sleeping problems.  (Tr. 848.)  The following month, Reynolds presented to Ms. Flynn with complaints that the Oleptro caused excessive drowsiness.  (Tr. 849.)  Ms. Flynn changed his medication to Seroquel.  (Tr. 849.)

On January 26, 2011, Ms. Flynn completed a Mental RFC Questionnaire.  (Tr. 850-854.)  Therein, Mrs. Flynn opined that Reynolds had an "unlimited or very good" ability to work in coordination with or proximity to others without being unduly distracted; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; travel in unfamiliar

---

[6] The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric Association, 4th ed revised, 2000) ("DSM-IV").  An individual's GAF is rated between 0 - 100, with lower numbers indicating more severe mental impairments. A GAF score between 0 - 50 indicates serious symptoms or any serious impairment in social, occupational or social functioning.  DSM-IV at 34.  A GAF score between 51 - 60 denotes "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)."  *Id.*

[7]  The acronym "MSN" refers to a Master of Science in Nursing.  A "CNS" is a Clinical Nurse Specialist.

4

places; and, use public transportation.  (Tr. 852-853.)  She further opined that Reynolds had a "limited but satisfactory" ability to remember work-like procedures; understand, remember, and carry out very short and simple instructions; maintain attention for a two hour segment; maintain attendance and punctuality; sustain an ordinary routine; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; ask simple questions or request assistance; respond appropriately to changes in a routine work setting; be aware of normal work hazards and take appropriate precautions; set realistic goals; deal with the stress of semiskilled and skilled work; and, interact appropriately with the general public.[8]  (Tr. 852-853.)

Ms. Flynn also opined that Reynolds was "seriously limited, but not precluded" in his abilities to accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers; and, deal with normal work stress.  (Tr. 852.)  In addition, she concluded that Reynolds would be likely to miss four or more work days per month due to his impairments or treatment.  (Tr. 854.)  Finally, she opined Reynolds' alcohol/substance abuse issues contributed to all of his mood and anxiety symptoms, and she was "uncertain" of what his limitations would be if Reynolds "were totally abstinent from alcohol or substance abuse."  (Tr. 854.)

### Hearing Testimony

At the March 2, 2011 hearing, Reynolds testified to the following:

---

[8]  Ms. Flynn stated she was "unable to assess" whether or to what degree of Reynolds was limited in his abilities to perform at a consistent pace without an unreasonable number and length of rest periods; understand and remember detailed instructions; and, carry out detailed instructions. (Tr. 852-853.)

- He graduated from high school and completed six months of vocational training in diesel mechanics. (Tr. 39.)

- Between 1993 and 2005, he worked in steel mills and a musical instrument factory. Thereafter, he had two short-term temporary jobs, as a punch press operator and stainless steel polisher. (Tr. 40 - 43.)

- He was homeless for several years, beginning in 2004. (Tr. 43.) He now lives in a trailer with his fiancé. (Tr. 39.)

- He has had back problems for over 25 years. (Tr. 44.) In the last ten years, the pain has become "unbearable." (Tr. 44, 50.) He experiences pinched nerve attacks three to four times per month, which "shuts him down" for two to three days. (Tr. 44-45.) He fractured his wrist and ankle years ago and, because he was homeless and had no health insurance, they were not properly set in a cast. (Tr. 46.) As a result, he experiences arthritis. (Tr. 46.)

- He cannot stand for any sustained length of time during an eight hour day because "I have to get up and down every hour" due to the pain. (Tr. 45.) He cannot sit for more than four hours total and, moreover, has to get up every hour to stretch. (Tr. 45.) He can lift 10 to 20 pounds. (Tr. 45.)

- He has experienced hearing loss for the past 15 years. His fiancé encouraged him to seek help for this condition. (Tr. 46.)

- He has suffered from depression since 2004. He sometimes has "suicidal thoughts, but they come and go." (Tr. 47.) He sees a psychiatrist once per month and has been prescribed medication. (Tr. 47 - 48.) Seroquel seems to help relieve his symptoms. (Tr. 48.)

- His pain and depression interfere with his sleep. (Tr. 47.) His concentration is also affected by his chronic pain. (Tr. 52.)

- He has a long history of alcohol and substance abuse. He has been sober "10 years out of the last 20. Not consecutive." (Tr. 48-49.) He goes to AA meetings. The last time he drank alcohol was November 5, 2010. (Tr. 49-50.) He has also used heroin and prescription pain medication. (Tr. 50.) The last time he used heroin was also in November 2010. (Tr. 51.)

- On a typical day, he gets up at 7 a.m., goes to the restroom, makes coffee, takes his dog on a 10 minute walk using a cane, and cooks breakfast "if the pain is not that bad." (Tr. 51.) His fiancé has to help him get dressed. He goes grocery shopping and to thrift stores with his fiancé, and watches movies. In the evening, he walks his dog again for ten minutes. (Tr. 51.) He has not driven in ten years

6

because he had a felony DWI in 2001 and does not have a driver's license. (Tr. 39.)

- He does not go out socially with his fiancé. (Tr. 47.) However, he believes he "get[s] along with people, now that I can hear them." (Tr. 47-48.)

Based on the hearing testimony and his review of the record regarding Reynolds' work history, the VE testified Reynolds had past relevant work as a polisher and buffer, and quality control technician. (Tr. 54-55.) The ALJ then posed the following hypothetical:

> I would like you to assume an individual who is 51 years of age and has a high school education and the claimant's past relevant work experience, who is capable to lift up to 10 pounds frequently and 20 pounds occasionally. Can stand or walk for about six hours and sit for up to six hours in an eight-hour work day, with normal breaks. Should not climb ladders, ropes or scaffolds. Can frequently stoop, kneel and crouch. Occasionally crawl. Could not work in a noisy environment or around hazards where auditory warnings are necessary. And this person is able to remember, understand and carry out simple and detailed but not complex instructions or tasks typical of occupations with an SVP of one or two. With those limitations, could such a person perform the claimant's past relevant work?

(Tr. 55.) The VE testified that this hypothetical individual would not be able to perform Reynolds's past relevant work but would be able to perform other jobs, including assembler, production; assembler, small products; and, parking lot cashier. (Tr. 55-56.)

The ALJ then asked whether the hypothetical claimant could still perform the three identified jobs if, in addition to the restrictions in the above hypothetical, he was limited to only superficial contact with the public and co-workers. (Tr. 56-57.) The VE testified that the hypothetical claimant could perform both assembler jobs, but not the parking lot cashier job. (Tr. 57.) The VE then testified there were other jobs such a hypothetical claimant could perform, including eyeglass frames polisher and night security guard. (Tr. 57-58.)

The ALJ then asked whether the hypothetical claimant could perform any work if he

7

would be off task at least 20 percent of an eight hour work day "due to accommodation of pain and symptoms of depression, fatigue, and an inability to concentrate."  (Tr. 58.)  The VE testified that such a restriction would preclude all work.  (Tr. 58.)

Reynolds' attorney then posed a series of questions to the VE.  He first asked the VE to adopt the ALJ's first two hypotheticals but add the restriction that the hypothetical claimant "would miss four days per month because of either the mental health issues or the physical issues." (Tr. 58-59.)  The VE testified such a restriction would eliminate all of the previously identified jobs. (Tr. 59.)  Reynolds's attorney then asked whether a sit/stand at will option would effect any of the previously identified jobs. (Tr. 59.)  The VE testified that it would not effect the parking lot cashier position, but would "greatly reduce" the number of security guard and assembler positions. (Tr. 59.)  Reynolds' attorney then asked whether the previously identified jobs would be available if the hypothetical claimant could not stand "at all" during an eight hour work day. (Tr. 59.)  The VE similarly testified that such a restriction would not effect the parking lot cashier position, but would reduce the number of security guard and assembler positions. (Tr. 59-60.)  Finally, Reynolds' attorney asked whether the previously identified jobs would be available if the hypothetical claimant was only able to sit for four hours out of an eight hour work day. (Tr. 60.)  The VE testified that such a restriction would not effect either the parking lot cashier or security guard positions, but would "eliminate some of" the assembler positions. (Tr. 60.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason

8

of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[9]

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Reynolds was insured on his alleged disability onset date, January 1, 2004, and remained insured through September 30, 2008.  (Tr. 15.)  Therefore, in order to be entitled to POD and DIB, Reynolds must establish a continuous twelve month period of disability commencing between those dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and

---

[9]  The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled.  For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

416.1201.

## IV.  Summary of Commissioner's Decision

The ALJ found Reynolds established medically determinable, severe impairments, due to degenerative disc disease, loss of hearing, depression, and substance abuse; however, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 17-19.)   Reynolds was found incapable of performing his past work activities, but was determined to have a Residual Functional Capacity ("RFC") for a limited range of light work.  (Tr.  19-24.)   The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Reynolds was not disabled.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists

in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.");

*McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. Analysis

### *Opinions of Denise Flynn, MSN CNS*

Reynolds first argues the ALJ improperly rejected Ms. Flynn's opinions that Reynolds (1) is "seriously limited" in his ability to accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and, deal with normal work stress; and, (2) would miss four or more work days per month because of his impairments or treatment. Specifically, he argues the ALJ repeatedly misidentified the author of these opinions as Ms. Fabian instead of Ms. Flynn; made contradictory findings; and, failed to account for evidence supporting Ms. Flynn's assessments. (Doc. No. 15 at 10-12.)

As an initial matter, the Commissioner maintains Ms. Flynn is not a "treating physician" under social security regulations and, therefore, her opinions are not entitled to controlling weight. The Commissioner concedes the ALJ mistakenly referred to the author of the January 2011 Mental RFC Questionnaire as Ms. Fabian. However, she argues this is harmless error since the ALJ properly recounted the contents of the Questionnaire, thoroughly analyzed the opinions at issue, and properly rejected them based on substantial evidence in the record. (Doc. No. 16 at 12-15.)

While Reynolds discusses the treating physician rule at length in his Brief, the Court agrees with the Commissioner that Ms. Flynn does not constitute a treating physician. Under

Social Security regulations, only "acceptable medical sources" are considered "treating sources" whose opinions may be entitled to controlling weight.  *See* 20 CFR §§ 404.1502/416.902, 404.1513(d)/416.913(d),  and 404.1527(d)/416.927(d); Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939 at * 2 (Aug. 9, 2006).  It is well-established that nurse practitioners, such as Ms. Flynn, are not "acceptable medical sources."  *See e.g. Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6ᵗʰ Cir. 2007); *Salyer v. Comm'r of Soc. Sec.*, 2012 WL 3156986 at * 5 (S.D. Ohio Aug. 3, 2012); *Wagner v. Comm'r of Soc. Sec.*, 2012 WL 3023266 at * 12 (N.D. Ohio July 24, 2012).  Rather, a nurse practitioner is an "other source" pursuant to 20 CFR §§ 404.1513(d)(1)/416.913(d)(1), which is neither entitled to controlling weight or subject to the "good reasons" requirement of the treating physician rule.  *See* SSR 06-03p, 2006 WL 2329939 at * 2;  *Everett v. Comm'r of Soc. Sec.*, 2012 WL 3731388 at * 11 (S.D. Ohio Aug. 28, 2012).

Nonetheless, evidence from "other sources" should not be ignored.  As explained in SSR 06-03p,  information from "other sources" (such as nurse practitioners) is "important" and "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  SSR 06-03P, 2006 WL 2329939 at * 2 -3 (Aug. 9, 2006).  Interpreting this SSR, the Sixth Circuit has found that opinions from "other sources" who have seen the claimant in their professional capacity "should be evaluated using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *Cruse,* 502 F.3d at 541 ("Following SSR 06-03P, the ALJ should have discussed the factors relating to his treatment of [nurse practitioner] Hasselle's assessment, so as to have provided some basis for why he was rejecting the opinion"). *See also McKitrick v. Comm'r of Soc. Sec.,* 2011 WL 6939330 at * 12-13 (N.D. Ohio Dec. 30, 2011);

13

*Kerlin v. Astrue*, 2010 WL 3937423 at * 7 (S.D. Ohio March 25, 2010).

Here, the ALJ recounted the medical evidence regarding Reynolds's depression and substance abuse, and concluded "the record does not demonstrate that [Reynolds] would be incapable of performing unskilled work" because of his mental impairments. (Tr. 21.) Specifically, she noted that, although he reported experiencing depression since 2005, Reynolds did not seek treatment until recently, indicating "that his symptoms are not as significant as he has alleged." (Tr. 21.) The ALJ also noted Reynolds's testimony that medication improved his condition, and recounted his numerous activities of daily living. (Tr. 21.) In addition, the ALJ explained that "medical professionals have found that [he] retains the type of mental capacity to perform at least at the unskilled work level." (Tr. 21.) In particular, she noted that "[i]n November 2010, Denise Flynn, M.S.N. diagnosed the claimant with depression, but she noted that the claimant's concentration and focus were normal." (Tr. 21.)

The ALJ then discussed the opinions regarding Reynolds's "serious limitations" set forth in the January 2011 Mental RFC Questionnaire. (Tr. 21-22.) Reynolds correctly notes that the ALJ mistakenly refers to the author of this Questionnaire as Ms. Fabian, rather than Ms. Flynn. However, the ALJ correctly identifies the Questionnaire (Exhibit 20F) and discusses it as follows:

> Ms. Fabian [sic] also provided a medical source statement that assesses the claimant's mental impairments in a manner consistent with the . . . residual functional capacity. Ms. Fabian found the claimant to be seriously limited in his ability to respond appropriately to directions and his ability to get along with peers without distracting them. (Exhibit 20F, p. 3). However, the undersigned would again note that this is inconsistent with the statements of the claimant and the third party report indicating that the claimant's mental condition does not affect his ability to get along with others. (Exhibit 5E, 7E). The reports from Ms. Fabian [sic] do not note any ongoing difficulty with social interaction with the claimant and he is noted to make good eye contact

14

and he is cooperative.  (Exhibits 17F, 19F).  Ms. Fabian [sic] also marked that the claimant would miss more than four days of work a month due to his impairment or treatment.  (Exhibit 20F, p. 5).  There is no analysis provided as to why the claimant would miss this work.  Furthermore, it appears to contradict the "very good" and "satisfactory" ratings in the form (Exhibit 20F, pp. 2-3) as well as the treatment records of Ms. Flynn (Exhibit 19F). Therefore, the claimant's mental impairments would affect him in that he is only able to remember, understand, and carry out simple and detailed, but not complex, instructions consistent with an SVP of 1 or 2.

(Tr. 21-22.)  The ALJ subsequently states that "[s]ome weight is provided to Rachel Fabian's [sic] opinion regarding the claimant's mental limitations, though the undersigned has not provided weight to her unsupported remark that the claimant would miss four or more days of work per month due to his mental impairment."  (Tr. 22.)  The ALJ formulated the RFC as follows:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity as to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can do no climbing of ladders, ropes or scaffolds; he can do frequent stooping, kneeling, and crouching; he can do only occasional crawling; he should not work in a noisy environment or around hazards where auditory warnings are necessary; and he is able to remember, understand, and carry out simple and detailed, but not complex, instructions consistent with an SVP of 1 or 2.

(Tr. 19.)

The Court finds the ALJ properly evaluated Ms. Flynn's opinions regarding Reynolds's "serious limitations" and predicted work absences.  As an initial matter, the Court agrees with the Commissioner that the ALJ's misidentification of Ms. Fabian as the author of these opinions constitutes harmless error.  The ALJ correctly identifies the Questionnaire as Exhibit 20F and accurately recounts the opinions at issue.  Moreover, as both Ms. Fabian[10] and Ms. Flynn are

_____

[10]  Ms. Fabian is a licensed social worker.  A social worker is not an "acceptable medical source." *See* 20 C.F.R. §§ 404.1513(a), (d); *Payne v. Commissioner*, 402 F. App'x

15

considered "other sources," there is no reason to believe that the ALJ's analysis would have been different if she had properly identified Ms. Flynn as the author.

The Court also rejects Reynolds's argument that the ALJ's assessment of Ms. Flynn's opinions is inherently contradictory. Reynolds argues that, because the ALJ states initially that Ms. Flynn assesses his mental impairments "in a manner *consistent* with" the RFC, it is contradictory for the ALJ to then find that Ms. Flynn's opinions regarding his serious limitations and predicted work absences are *inconsistent* with the evidence. (Doc. No. 15 at 10-11.) The Court disagrees. Ms. Flynn sets forth a number of opinions regarding Reynolds's mental abilities in the January 2011 Mental RFC Questionnaire, the majority of which indicate that Reynolds is able to function satisfactorily in a work setting. Indeed, Ms. Flynn opines that Reynolds's mental abilities are either "unlimited/very good" or "limited but satisfactory" in nineteen of the twenty-five categories set forth in the Questionnaire. (Tr. 852-853.) Of the remaining six categories, Ms. Flynn is "unable to assess" his abilities as to three. (Tr. 852-853.) Thus, it was not inherently contradictory for the ALJ to state that, overall, Ms. Flynn assessed Reynolds's mental impairments in a manner consistent with the RFC, and at the same time reject her opinions regarding Reynolds's "serious limitations" and predicted work absences. Rather, this is simply a situation where the ALJ accepted the majority of Ms. Flynn's opinions but disagreed with her findings of more serious limitations.

Finally, the Court finds the ALJ did not fail to properly evaluate Ms. Flynn's opinions that

---

109, 119 (6th Cir.2010) ("[S]ocial workers are not acceptable medical sources under social security regulations."); *Gustafson v. Comm'r of Soc. Sec.*, 2013 WL 782864 at * 7 (W.D. Mich. Jan. 28, 2013). The opinion of a social worker is not entitled to any particular weight. *See Hayes v. Commissioner*, 2011 WL 2633945, at *6 (W.D.Mich. June 15, 2011) (collecting cases); *Gustafson*, 2013 WL 782864 at * 7.

16

Reynolds is "seriously limited, but not precluded" in his ability to accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and, deal with normal work stress. The ALJ explained these opinions were inconsistent with Reynolds's own statements and the third-party statement of his fiancé, which indicate that Reynolds socializes with his fiancé and engages in other social behavior such as going to AA meetings, the library, and the beach. (Tr. 191-198, 178-185.) Moreover, to the extent Reynolds reported social difficulties, he consistently indicated those difficulties were due to his hearing impairment, rather than his mental condition. (Tr. 179, 183, 195-196). However, the record reflects Reynolds obtained hearing aids and that, with them, he was evaluated as being able to "understand most speech" in both quiet and noisy environments. (Tr. 856.) Indeed, at the hearing, Reynolds testified that he believes that he "get[s] along with people, now that I can hear them." (Tr. 47-48.)

In addition, the ALJ did not fail to properly evaluate Ms. Flynn's opinion that Reynolds would miss four or more days of work per month. The ALJ noted that "there was no analysis as to why [he] would miss this work" and, further, it "appears to contradict the 'very good' and 'satisfactory' ratings on the form." (Tr. 22.) Given that most of Ms. Flynn's opinions suggested Reynolds is able to function satisfactorily in a work setting, it was not unreasonable for the ALJ to determine that Ms. Flynn's opinion regarding excessive work absences was contradictory to the rest of her opinions. Moreover, aside from arguing generally that he is depressed, Reynolds does not direct this Court to any evidence in the record suggesting the ALJ improperly rejected this particular opinion.

In sum, because Ms. Flynn is an "other source," the ALJ was not required to accord any

17

particular weight to her opinions regarding serious limitations and predicted work absences, nor was she required to provide "good reasons" for rejecting them. Rather, the ALJ was required only to evaluate Ms. Flynn's opinions using the applicable factors, "including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *Cruse,* 502 F.3d at 541. For the reasons set forth above, the Court finds the ALJ fully complied with this requirement and, further, that her rejection of Ms. Flynn's opinions is supported by substantial evidence in the record.

Reynolds's first assignment of error is without merit.

### *Credibility*

Reynolds also argues the ALJ erred in finding him to be less than fully credible. He argues the ALJ improperly discredited him based upon lack of diligence in seeking treatment "when the record makes clear he was unable to receive it" due to his homelessness and lack of insurance. (Doc. No. 15 at 13.) In addition, Reynolds maintains the ALJ improperly characterized his activities of daily living as more extensive than reflected in the record. (Doc. No. 15 at 14.)

A claimant's subjective statements concerning his symptoms are not enough to establish disability. *See* SSR 96–7p, Introduction. When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment. Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms." *Id*. If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. *Id.* Credibility

18

determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight."  SSR 96–7p, Purpose section; *see also Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so"); *Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 733 (N.D.Ohio 2005) (stating that an ALJ should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

   To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* SSR 96–7p, Purpose.  Beyond medical evidence, there are seven factors that the ALJ should consider.[11]  The ALJ need not analyze all seven factors, but should show that he

---

[11]  The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96–7p, Introduction; *see also Cross*, 373 F.Supp.2d at 732.

19

considered the relevant evidence.  *See Cross*, 373 F.Supp.2d at 733; *Masch v. Barnhart*, 406 F.Supp.2d 1038, 1046 (E.D.Wis.2005).

Here, the ALJ found that Reynolds's impairments could reasonably be expected to cause the alleged symptoms, however, his statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible.  (Tr. 20.)  In support of this conclusion, the ALJ noted that, although Reynolds had bilateral hearing loss, his hearing improved to 80% discrimination in his right ear, and 92% in his left ear with hearing aids.  (Tr. 20.)  With respect to his back pain, the ALJ noted that imaging revealed only mild degenerative disc disease and that Reynolds had reported improvement with medication.  (Tr. 20.)  With respect to his mental impairments, the ALJ noted that, although Reynolds had reported experiencing symptoms of depression since 2005, he had not sought mental health treatment until 2010, "indicating that his symptoms are not as significant as he alleged." (Tr. 21.)  The ALJ also noted his improvement with treatment and medication.  (Tr. 21.)  The ALJ then explained as follows:

> When assessing the claimant's symptoms and limitations, the undersigned has considered the claimant's treatment history, activities of daily living, and credibility. The claimant has not generally received the type of medical treatment one would expect for a totally disabled individual.  The record reveals relatively infrequent trips to the doctor for the allegedly disabling symptoms.  While there is alleged pain, the claimant's treating physicians have not provided sufficient analysis to justify restrictions beyond the above residual functional capacity.  The claimant's activities of daily living also undercut his alleged limitations.  The claimant testified that he takes his dog for walks, makes coffee, prepares breakfast, goes shopping with his girlfriend, and watches movies.  These activities indicate that the claimant's alleged impairments do not prevent him from performing normal tasks.  Finally, the claimant's statements regarding his condition are inconsistent with the medical record.  Medical evidence demonstrates that the claimant has only mild degenerative changes in his spine, but he alleges chronic pain that continues despite the use of medication.  Additionally, Dr. Wyatt noted that the claimant did have improved back pain upon receiving medication. (Exhibit 18F, p. 9).  Overall, the claimant's allegations of pain and inability to

20

> work are not supported by the record.  The claimant is found to be less than
> fully credible, and his statements of pain and limitations are given little
> weight.

(Tr. 22.)

The Court finds the ALJ did not improperly assess Reynolds's credibility.  While Reynolds's homelessness and lack of health insurance may have impacted his ability to obtain treatment, the decision provides a number of additional reasons for finding Reynolds to be less than fully credible, including his improvement with medication and extensive daily activities. Reynolds complains the ALJ overstated his daily activities, citing evidence that he only walked his dog for ten minutes and his bathing and appetite are affected by his depression.  However, Reynolds's hearing testimony, adult function report, and his fiance's third party statement reflect a broad array of daily activities, including walking; fishing; going to the library, the beach, and AA meetings; cleaning; doing laundry and house repairs; watching movies; and, reading.  (Tr. 51, 178-185, 191-198.)

It is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec*., 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)).  *See also Vance v. Comm'r of Soc. Sec*., 2008 WL 162942 at * 6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is *not* the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.")  The ALJ provided sufficiently specific reasons for his credibility determination and supported those reasons with reference to specific evidence in the record.

21

Reynolds's second assignment of error is without merit.

## VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence.  Accordingly, the decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.


/s/ Greg White
U.S. Magistrate Judge

Date: September 23, 2013